Filed 11/7/13  P. v. Williams CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B238508 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA348603) |
| v. | |
| JESSICA MARIE WILLIAMS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Sam Ohta, Judge.  Affirmed.

Thomas T. Ono, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews and Roberta L. Davis, Deputy Attorneys General, for Plaintiff and Respondent.

* * * * * *

Appellant Jessica Marie Williams appeals from the judgment after her conviction by jury of the attempted willful, deliberate and premeditated murder of Joshua Earles (Pen. Code, §§ 187, subd. (a), 664; count 1),[1] the first degree murder of Fenton Brown (§ 187, subd. (a); count 2), and the unlawful possession of a firearm by a felon (§ 12021, subd. (a)(1); count 3). The jury found true the allegations that appellant personally and intentionally discharged a firearm which proximately caused great bodily injury and death (§12022.53, subds. (b)-(d)), and the offenses were committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1) (C)). The trial court sentenced appellant to state prison for a total term of 75 years to life plus life.

Appellant contends that (1) the trial court erred by denying her motion to dismiss based on the prosecution's failure to notify the defense of a witness's deportation and by excluding the deported witness's statement to the police; (2) her *Wheeler/Batson*[2] motion was erroneously denied; and (3) the trial court abused its discretion by denying her *Pitchess*[3] motion. Finding no error, we affirm the judgment.

## FACTS

Mona Sanders met appellant in November 2007. The two developed an intimate relationship and appellant often spent the night at Sanders's house. Appellant was a member of the Eight Tray Hoovers gang and her moniker was "Groove." She wore jeans and tank tops. She wore her hair in braids and "looked like a male." Sanders was associated with the Westside Trouble gang which was friendly with the Eight Tray Hoovers. Appellant purchased a black Chevy Caprice but the car was registered to Sanders because appellant did not have a driver's license.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*); *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*).

[3] *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*).

Early in the morning of May 29, 2008, appellant called Connie Aldridge and asked her to buy some bullets for her. Later that night, Sanders, Aldridge, a man known as "Max," and appellant drove in the Chevy Caprice to the Big 5 Sporting Goods store in Inglewood. Sanders did not know Max but saw him with appellant in the past. Aldridge purchased a box of Remington .40-caliber Smith and Wesson bullets and gave them to appellant.[4] Both Sanders and appellant drove the Caprice and usually parked it in front of Sanders's house. Sometime after the purchase of the bullets and prior to her arrest, appellant asked Sanders to start parking the car at the back of the house.

On May 30, 2008, Joshua Earles was walking from his house towards the corner of 104th Street and South Manhattan Place when an older model black car pulled up behind him. The car was an "old school Caprice or . . . Impala" and looked "like an old cop car." The passenger had braided hair and wore a New York Yankees baseball cap backwards. The passenger asked Earles where he was from. As Earles started to back up, the passenger, using a black handgun with brown grips, shot at him. Earles ran away but was struck by four bullets and suffered injuries to his chest, right shoulder, and left leg. Officer Gui Juneau of the Los Angeles Police Department (LAPD) responded to the scene of the Earles shooting and recovered 10 shell casings.

On June 2, 2008, Jonathan McKeone was inside his house when he heard a gunshot coming from the intersection of 67th Street and Vermont Avenue. He looked out the window and saw a person backing up toward a black car and shooting towards Vermont Avenue. The shooter was dressed in a white T-shirt with dark pants, and wore a baseball cap backwards. The car was parked under a streetlight and McKeone saw the shooter and another person get into the car and drive westbound on 67th Street past his

---

**4**     Electronic records obtained from the Inglewood Big 5 store showed a sale of one box of Remington .40-caliber Smith and Wesson bullets at 8:52 p.m. on May 29, 2008.

house.  At trial, McKeone testified that he could not tell if the shooter was male or female because he only saw the shooter from the side.**5**

On June 2, 2008, Carlos Grenald was inside his house near 67th Street and Vermont Avenue when he heard approximately eight gunshots.  He went to his front door and heard what sounded like a male voice yell "Hoover."  He heard two car doors close and then saw a dark colored sedan speed westbound on 67th Street past his house.  Grenald walked to the corner of the block and found 19-year-old Fenton Brown crawling on the ground.  He could see gunshot wounds to Brown's arms.  He yelled at other people who were beginning to gather at the scene to call 9-1-1.  Brown told Grenald that he was coming from the liquor store two blocks away and had been in an altercation with some Bloods gang members at the liquor store.

LAPD Officer Jessie West and his partner were the first officers to respond to the scene of the Brown shooting.  Brown had multiple gunshot wounds and his clothing was saturated with blood.  He was having difficulty breathing and asked Officer West if he was going to die.  Brown told Officer West that he was standing on the corner of 67th Street and Vermont when two African-American females wearing T-shirts approached him and asked "Where are you from?"  Brown responded he was "not from anywhere" and did not "bang."  One of the women pulled out a semi-automatic firearm and began shooting at Brown.  While he was running away he looked over his shoulder and saw both women fleeing in the direction of a black car.  Brown suffered six gunshot wounds and died approximately 30 minutes later at the hospital.  LAPD Detective Linda Heitzman processed the crime scene and recovered 10 shell casings.

On June 3, 2008, at approximately 6:55 p.m., LAPD Officer Nicholas Hartman and his partner Officer Prodigalidad, accompanied by Deputy Probation Officer Chon, were patrolling in a black and white police car on 81st Street near Hoover Avenue.  Officer Hartman saw appellant walking down the street in the opposite direction.  Appellant turned into a courtyard and started walking faster after she looked over her

---

**5**      In a pretrial statement, McKeone told the police the shooter was male.

shoulder towards the police car. When the police officers stopped the car to speak with appellant, she sprinted away from them. The officers gave chase and Officer Hartman observed appellant take a blue steel semiautomatic gun with brown grips from her waistband and throw it over a chain-link fence. Appellant was arrested and the gun which had one .40-caliber round in the chamber and 10 in the magazine was retrieved.

At the time of her arrest, appellant was wearing a New York Yankees baseball hat commonly worn by the Neighborhood Crips, a rival gang of the Eight Tray Hoovers. Appellant asked Officer Hartman if he liked her "nap" hat.[6] Appellant also wore a belt buckle with the letter "H" which stood for "Hoovers." Appellant had three bindles of rock cocaine, a cell phone, and car keys in her pocket. The car keys were for a 1991 Chevy Caprice that was parked close to the area where appellant was detained.

LAPD firearm examiner Rafael Garcia determined that the shell casings recovered from the Earles shooting and the shell casings recovered from the Brown shooting were fired from the gun that appellant discarded at the time of her arrest.

The prosecution's gang expert, Officer Hartman, testified he was assigned to the 77th Division Gang Enforcement Detail and was responsible for the Eight Tray Hoovers gang. He explained that a gang member acquires status within the gang by committing crimes, especially violent crimes. It was dangerous for a gang member to be seen by rival gang members in the rival gang's territory. In gang culture, a "mission" involved a plan to commit a crime and then the execution of the plan. Driving into a rival gang's territory and shooting someone would be a typical gang "mission." That type of crime showed the community that the shooter and his or her gang were dangerous and powerful.

The Eight Tray Hoovers gang, also known as the 83rd Hoovers gang, had approximately 200 members and was one of eight active cliques within the larger Hoovers gang. Their primary activities included murders, robberies, narcotic sales,

---

[6] "Nap" is a derogatory term used to refer to members of the Neighborhood Crips gang.

weapons violations, carjackings, burglaries, identity thefts, and shootings. Officer Hartman opined that appellant was a member of the Eight Tray Hoovers based on a number of factors: her admitted membership, her gang tattoos which included "8" on her left tricep and "3rd" on her right tricep, as well as "Fuck" on her right shoulder, and "Napps" on her left shoulder, and the circumstances of the shootings and her arrest.

When asked a hypothetical question based on the facts of this case, Officer Hartman opined that the shootings were committed for the benefit of and in association with a criminal street gang. The shootings benefitted the Eight Tray Hoovers by demonstrating the gang's power over rival gangs and by causing fear and intimidation in the community. The area where Earles was shot was claimed by the Rollin' 100's gang, an affiliate of the Neighborhood Crips, which was a mortal enemy of the Eight Tray Hoovers. The Neighborhood Crips identified with the New York Yankees logo and an Eight Tray Hoovers gang member would wear a New York Yankees baseball cap so the shooter could blend into the surroundings in Rollin' 100's territory. The east side of the street where Brown was shot was claimed by the 65 Menlo Gangster Crips while the west side was claimed by the 67 Neighborhood Crips. Both Crips gangs were allies of each other and rivals of the Eight Tray Hoovers.

No evidence was presented on behalf of appellant.

## DISCUSSION

I. **Appellant's Motion to Dismiss and Motion to Admit Deported Witness's Statement**

*A.     Contention*

Appellant contends that the denial of her motion to dismiss based on the prosecution's alleged failure to immediately notify the defense of a witness's deportation violated her federal constitutional rights to compulsory process and due process by depriving her of the favorable testimony of a material witness. Appellant also contends the court erred in excluding the deported witness's hearsay statement to the police.

6

### B. *Background*

Attached to appellant's motion for dismissal was a declaration in which defense counsel alleged that on June 11, 2008, Jose Ricardo De Lao told LAPD Detective Bertha Durazo that he witnessed the June 2, 2008 Brown shooting and that it was committed by two African-American men. Defense counsel was appointed on November 19, 2008, and understood that discovery of witnesses' addresses was generally not provided in gang cases until trial. Nevertheless, defense counsel made written requests for De Lao's address on January 12, 2009, March 31, 2009, and again on October 26, 2009. On December 22, 2009, when the defense investigator met with Detective Durazo to interview civilian witnesses, she informed him that De Lao had been deported to Mexico in August 2008. The defense investigator contacted various United States Immigration and Customs Enforcement offices to locate De Lao, but his efforts were unsuccessful.

On April 26, 2011, a hearing on the motion to dismiss was held. Detective Durazo testified that she was aware that Brown told officers at the scene that two females shot him. When she interviewed De Lao on June 11, 2008, he told her that two men committed the murder. De Lao provided his employment and residence information to Detective Durazo. De Lao was not in custody at that time, lived and worked in the area, and gave no indication to Detective Durazo that he intended to move away from the area. The case against appellant was filed in November 2008. On July 8, 2009, when Detective Durazo was serving subpoenas for the preliminary hearing, she learned that De Lao had been taken into custody on a narcotics-related charge and deported. Detective Durazo was not aware of De Lao's immigration status.

After Detective Durazo testified, defense counsel conceded that he had not shown "sufficient misconduct on the part of law enforcement based on the record presented to the court" that warranted dismissal. Defense counsel asked the trial court to permit him to use De Lao's statement at trial because it was reliable hearsay and material to the defense. The trial court denied the motion to dismiss on the ground that appellant had failed to show misconduct by the prosecution or police. With respect to the motion to

7

admit De Lao's statement, defense counsel cited *Chambers v. Mississippi* (1973) 410 U.S. 284 (*Chambers*). The trial court found *Chambers* dealt with a "unique" situation and distinguished it from the "standard" situation presented in this case. De Lao's statement did not fall within any exception to the hearsay rule and the trial court denied the motion to admit it.

### C. Analysis

#### 1. Motion to Dismiss

Under the "compulsory process" clauses of the federal and state Constitutions, a defendant has a constitutional right to compel the testimony of a witness who has evidence favorable to the defense. (*People v. Jacinto* (2010) 49 Cal.4th 263, 268–269.) To prevail on a claim of prosecutorial violation of the right to compulsory process, the defendant must establish that the prosecution engaged in conduct that was entirely unnecessary to the proper performance of its duties, the conduct was a substantial cause of the loss of the witness's testimony, and the defendant must show that the testimony could have been material and favorable to the defense. (*In re Martin* (1987) 44 Cal.3d 1, 31–32.) When reviewing appellant's claim that her compulsory process rights were violated, we use the standard generally applied to issues involving constitutional rights; i.e., we defer to the trial court's factual findings if supported by substantial evidence, and independently review whether a constitutional violation has occurred. (See *People v. Cromer* (2001) 24 Cal.4th 889, 894, 900–901; *People v. Seijas* (2005) 36 Cal.4th 291, 304.)

Appellant's contention fails because substantial evidence supports the trial court's finding that appellant failed to show any prosecutorial misconduct. De Lao's deportation was handled by a federal government agency and Detective Durazo first learned of it in July 2009, 11 months after it had occurred. The discovery laws did not require the prosecution to provide any prosecution witness's address until 30 days before trial. (§§ 1054.1 & 1054.7.) The prosecution informed the defense of De Lao's deportation in December 2009, approximately one year and four months prior to trial. Appellant claims

8

the prosecution's delay in informing the defense was a substantial cause in denying her a meaningful opportunity to locate De Lao. The prosecution played no role in the deportation of De Lao, and appellant has not shown how learning of the deportation five months earlier would have enabled her to locate De Lao.

Furthermore, appellant failed to show that De Lao's testimony was "material and favorable to [her] defense, in ways not merely cumulative to the testimony of available witnesses." (*United States v. Valenzuela-Bernal* (1982) 458 U.S. 858, 873.) Much of De Lao's statement was consistent with other prosecution testimony. His description of the driver matched appellant's age, his description of the car was similar to appellant's car, and he noted that the driver who shot Brown wore a cap. De Lao identified the assailants as men but this testimony was cumulative to McKeone's pretrial statement to police that a man committed the June 2 shooting and to Grenald's testimony that the voice of the assailant who shouted "Hoovers" sounded male. Additionally, evidence at trial indicated that appellant dressed and looked like a male at the time of the shootings.

Appellant's reliance on *People v. Mejia* (1976) 57 Cal.App.3d 574 (*Mejia*), is misplaced. In *Mejia*, the court upheld dismissal of a felony prosecution when percipient witnesses arrested with defendant were unavailable to testify because they had been released to immigration officials and deported. The court stated at page 580: "Generally speaking the People may select and choose which witnesses they wish to use to prove their case against a defendant. They are not, however, under principles of basic fairness, privileged to control the proceedings by choosing which material witnesses shall, and which shall not, be available to the accused in presenting his defense." As previously noted, the prosecution played no role in De Lao's deportation and *Mejia* is inapposite.

Appellant asserts that regardless of any lack of bad faith by the prosecution, there was *Brady*[7] error. Appellant cannot establish any element of a *Brady* claim. She does not assert a typical *Brady* violation, "involv[ing] the discovery, after trial, of information

_____

[7] *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*).

9

which had been known to the prosecution but unknown to the defense." (*United States v. Agurs* (1976) 427 U.S. 97, 103, disapproved on another ground in *United States v. Bagley* (1985) 473 U.S. 667, 676–683.) Nor does she claim that true impeachment evidence, that is, evidence tending to cast doubt on the credibility of a testifying witness, was withheld. De Lao's deportation does not assist appellant's claim because it did not hurt the prosecution's case or help the defense. (*People v. Morrison* (2004) 34 Cal.4th 698, 714.) Nor was it material to appellant's defense because it was not reasonably probable that earlier disclosure of the deportation would have caused a different result. Appellant tried unsuccessfully for one year and four months to procure De Lao's presence at trial and did not show how knowing about the deportation five months earlier would have produced a different result.

## 2. Motion to Admit De Lao's Statement

We review the trial court's rulings on the admission of evidence for abuse of discretion. (*People v. Waidla* (2000) 22 Cal.4th 690, 724.) Evidence of out-of-court statements offered to prove the truth of the matter stated is hearsay, but such evidence is admissible if it qualifies under an exception to the hearsay rule. (Evid. Code, § 1200, subd. (a); *People v. Lewis* (2008) 43 Cal.4th 415, 497.)

Appellant does not identify any Evidence Code exception to the hearsay rule that is relevant to this case but argues that "'exceptions to the hearsay rule'" may also be found in "'decisional law.'" Appellant contends that De Lao's statement was reliable and crucial to establish her innocence and should have been admitted pursuant to *Chambers, supra,* 410 U.S. 284 to preserve her due process right to present a defense.

In *Chambers*, a defendant in a murder trial called a witness who had previously confessed to the murder. (*Chambers, supra,* 410 U.S. at p. 294.) After the witness repudiated his confession on the stand, the defendant was denied permission to examine the witness as an adverse witness based on Mississippi's "'voucher' rule" which barred parties from impeaching their own witnesses. (*Id.* at pp. 294–295.) Mississippi did not recognize an exception to the hearsay rule for statements made against penal interests,

10

thus preventing the defendant from introducing evidence that the witness had made self-incriminating statements to three other people. (*Id.* at pp. 297–299.) The United States Supreme Court noted that the State of Mississippi had not attempted to defend or explain the rationale for the voucher rule. (*Ibid.*) The court held that "the exclusion of this critical evidence, coupled with the State's refusal to permit [the defendant] to cross-examine [the witness], denied him a trial in accord with traditional and fundamental standards of due process." (*Id.* at p. 302.)

In *People v. Ayala* (2000) 23 Cal.4th 225 (*Ayala*), the California Supreme Court considered whether the defendant "had either a constitutional or a state law right to present exculpatory but unreliable hearsay evidence that is not admissible under any statutory exception to the hearsay rule." (*Id.* at p. 266.) The defendant relied on *Chambers* and argued the trial court had "infringed on various constitutional guaranties when it barred the jury from hearing potentially exculpatory evidence." (*Ayala, supra,* at p. 269.)

*Ayala* rejected the defendant's argument and held that "'[f]ew rights are more fundamental than that of an accused to present witnesses in his own defense. [Citations.] [But i]n the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence.' [Citation.] Thus, '[a] defendant does not have a constitutional right to the admission of unreliable hearsay statements.' [Citations.] Moreover, both we [citation] and the United States Supreme Court [citation] have explained that *Chambers* is closely tied to the facts and the Mississippi evidence law that it considered. *Chambers* is not authority for the result defendant urges here." (*Ayala, supra,* 23 Cal.4th at p. 269.)

Appellant argues that De Lao's statement bears persuasive assurances of trustworthiness and therefore its admission is compelled. But the United States Supreme Court has clarified that *Chambers* "does not stand for the proposition that the defendant is denied a fair opportunity to defend himself whenever a state or federal rule excludes

11

favorable evidence." (*United States v. Scheffer* (1998) 523 U.S. 303, 316.) The Court went on to explain that, by its ruling, it was *not* signaling a diminution in the validity or respect normally accorded to the states regarding their rules of criminal procedure and evidence, but only that, *given the unique facts of that case,* the court had found the defendant there had been deprived of a fair trial. (*Chambers, supra,* 410 U.S. at pp. 302–303.)

The circumstances of this case did not approach those of *Chambers* where constitutional rights directly affecting the ascertainment of guilt were implicated. The trial court did not apply the hearsay rule "mechanistically to defeat the ends of justice" (*Chambers, supra,* 410 U.S. at p. 302) and we find no abuse of discretion.

## II.    Appellant's *Wheeler/Batson* Motion

Appellant, who is African-American, contends the prosecutor improperly exercised a peremptory challenge against an African-American prospective juror on the basis of race. A party violates both the California and United States Constitutions by using peremptory challenges to remove prospective jurors solely on the basis of group bias, i.e., bias presumed from membership in an identifiable racial, religious, ethnic, or similar group. (*Wheeler, supra,* 22 Cal.3d at pp. 276–277; *People v. Lancaster* (2007) 41 Cal.4th 50, 74; *Batson, supra,* 476 U.S. at pp. 96–98.) A party who believes his opponent is doing so must timely object and make a prima facie showing of exclusion on the basis of group bias. (*Wheeler, supra,* at p. 280.) A prima facie showing requires that the party make as complete a record as possible, show that the persons excluded belong to a cognizable group, and produce evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred. (*Lancaster, supra,* at p. 74; *Johnson v. California* (2005) 545 U.S. 162, 170.)

If a prima facie case is shown, the burden shifts to the other party to show that the peremptory challenge was based upon "specific bias," i.e., one related to the case, parties, or witnesses. (*Wheeler, supra,* 22 Cal.3d at pp. 276, 281–282.) This showing need not rise to the level of a challenge for cause. (*Id.* at pp. 281–282.) Although a party may

12

exercise a peremptory challenge for any permissible reason or no reason at all, implausible or fantastic justifications are likely to be found to be pretexts for purposeful discrimination. (*People v. Huggins* (2006) 38 Cal.4th 175, 227 (*Huggins*); *Purkett v. Elem* (1995) 514 U.S. 765, 768.)

The trial court must then make a sincere and reasoned attempt to evaluate the explanation for each challenged juror in light of the circumstances of the case, trial techniques, examination of prospective jurors, and exercise of challenges. (*People v. Fuentes* (1991) 54 Cal.3d 707, 718.) It must determine whether a valid reason existed and actually prompted the exercise of each questioned peremptory challenge. (*Id.* at p. 720.) The proper focus is the subjective genuineness of the nondiscriminatory reasons stated by the prosecutor, not on the objective reasonableness of those reasons. (*People v. Reynoso* (2003) 31 Cal.4th 903, 924.) Neither *Wheeler* nor *Batson* overturned the traditional rule that peremptory challenges are available against individual jurors whom counsel suspects of bias even for trivial reasons. (*People v. Montiel* (1993) 5 Cal.4th 877, 910, fn. 9.) "To rebut a race– or group–bias challenge, counsel need only give a *nondiscriminatory* reason which, under all the circumstances, including logical relevance to the case, appears *genuine* and thus supports the conclusion that race or group prejudice *alone* was not the basis for excusing the juror." (*Ibid.*) "[T]he issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible. Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." (*Miller-El v. Cockrell* (2003) 537 U.S. 322, 339.) "In assessing credibility, the court draws upon its contemporaneous observations of the voir dire. It may also rely on the court's own experiences as a lawyer and bench officer in the community, and even the common practices of the advocate and the office who employs him or her." (*People v. Lenix* (2008) 44 Cal.4th 602, 613 (*Lenix*).)

13

Prospective Juror No. 6 (Juror No. 6) told the court he lived in Ladera Heights, was single, and had no prior jury experience.  He was a college student majoring in criminal justice and aspired to work in law enforcement.  When he was five or six years old in the mid 1990's, his half-brother was convicted of felony assault.  He did not know "too much" about the conviction and it did not affect how he thought about law enforcement.  When the court asked if the jurors were familiar with criminal street gangs, Juror No. 6 stated that when he was in high school he knew gangs were "around" and he knew members of African-American gangs at his high school but was not friends with them and did not have any contact with them at the time of trial.  He said he could limit himself to the gang evidence presented at trial and not insert his own knowledge of gangs into his decision making in the case.  Juror No. 6 became aware of the Eight Tray Hoovers when he was in high school but was not friends with any members of that gang or other gangs that were either affiliated with or enemies of the Eight Tray Hoovers.  He said he had been approached or "banged on" once or twice outside of school but nothing happened, and he had never been asked to join a gang.  He indicated he understood circumstantial evidence, acknowledged that any witness can possibly lie, and felt he was "an independent person" and would not change his mind about his view of the case even if the other 11 jurors disagreed with him.

The prosecutor exercised his fifth peremptory challenge against Juror No. 6 and defense counsel made a *Wheeler/Batson* motion stating that Juror No. 6 was "one of the only two African-Americans in the room."  The trial court explained that defense counsel was using the wrong standard and asked him to set forth the basis for the motion.  The trial court found defense counsel made a prima facie showing with respect to Juror No. 6 and asked the prosecutor to explain why he excused him.  The prosecutor replied, "The reason I excused Juror No. 6 is precisely some of the reasons that the defense attorney I guess thought he would be a good juror.  He is by far the youngest person in the group.  I question whether or not he has enough life experience for a case of this magnitude.  He didn't appear to be very mature in the way he answered the questions and the way he

14

responded to questions. The fact that he is a student taking criminal justice classes makes me nervous because I don't know what he's being taught about the law. He also had a half brother who I think had been convicted of an assaultive crime. And the last, but certainly not least, is the fact that he went to high school, was aware of a number of gang members, he even specifically had had contact or had knowledge of Eight Tray Hoovers." The prosecutor concluded that he would have excused Juror No. 6 for any one of those reasons, but especially when considered collectively.

The court denied the *Wheeler* motion finding there was no discriminatory purpose and stated, "The reasons stated by [the prosecutor] are race neutral reasons. And they're supported by the record as given by the statements of the juror in court to answers of questions posed."

Appellant argues the trial court did not make a "sincere and reasoned evaluation of the proffered third step justifications."

Because *Wheeler* motions call upon trial judges' personal observations, we view their rulings with considerable deference, provided that the trial court makes a sincere, reasoned effort to evaluate the justifications offered. (*Lenix, supra,* 44 Cal.4th at pp. 613–614.) Where deference is due, the trial court's ruling is reviewed for substantial evidence. (*Huggins, supra,* 38 Cal.4th at p. 227.) In discussing *Batson* analysis the United States Supreme Court stated, """First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race[; s]econd, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question[; and t]hird, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination."' [Citations.]" (*Snyder v. Louisiana* (2008) 552 U.S. 472, 476–477 (*Snyder*).) *Snyder* also noted, "The trial court has a pivotal role in evaluating *Batson* claims. Step three of the *Batson* inquiry involves an evaluation of the prosecutor's credibility, [citation], and 'the best evidence [of discriminatory intent] often will be the demeanor of the attorney who exercises the challenge,' [citation]." (*Id*. at p. 477.)

Here, the prosecutor provided a race-neutral reason for excusing Juror No. 6. The trial court evaluated the prosecutor's explanation and found it credible. The important point was the trial court's opinion of the "subjective *genuineness*" of the nondiscriminatory reasons stated by the prosecutor, "*not . . .* the objective *reasonableness* of those reasons." (*People v. Reynoso, supra,* 31 Cal.4th at p. 924.) A prosecutor's "explanation need not be sufficient to justify a challenge for cause." (*People v. Turner* (1994) 8 Cal.4th 137, 165, overruled on another point in *People v. Griffin* (2004) 33 Cal.4th 536, 555, fn. 5.) Even a hunch is sufficient, so long as it is not based on impermissible group bias. (*Turner, supra*, at p. 165.) What mattered here was not whether the prosecutor articulated a highly persuasive ground for excusing Juror No. 6, but that the ground was race-neutral and the trial court assessed the prosecutor's explanation and concluded it was subjectively genuine. The trial court had the benefit of its contemporaneous observations of both voir dire and the prosecutor's demeanor as he explained his reason for excusing Juror No. 6.

Citing *Miller-El v. Dretke* (2005) 545 U.S. 231 (*Dretke*), appellant argues that this court should employ comparative analysis; in other words, to compare Juror No. 6 to jurors who were not excused to determine whether the prosecutor's expressed reasons were pretextual. *Dretke* does not compel a different result. There, the high court held that if a prosecutor's stated reason for striking a member of a cognizable group applies equally to an "otherwise-similar" juror who is not a member of the cognizable group, then that is "evidence tending to prove purposeful discrimination to be considered on *Batson's* third step." (*Dretke, supra,* at p. 241.) Appellant points out that some of the other jurors shared Juror No. 6's familiarity with gangs, or also had family members arrested. However, none of the seated jurors had the same combination of characteristics as Juror No. 6–young and immature, currently enrolled in criminal justice courses, had a relative who was convicted of a violent offense and was familiar with African-American gangs, including appellant's gang. On this record, therefore, appellant's comparative analysis is unreliable and fails to demonstrate purposeful discrimination. The fact that we

16

might reasonably derive an inference of discriminatory intent from a comparative analysis does not mean that a *Wheeler/Batson* motion was incorrectly denied. (*Lenix, supra,* 44 Cal.4th at pp. 627–628.) Therefore, a comparative analysis does not compel a conclusion that the trial court erred in accepting the prosecutor's stated reasons for excusing the prospective challenged juror.

## III. Appellant's *Pitchess* Motion

Appellant contends the trial court abused its discretion by denying her *Pitchess* motion. She asserts she presented a sufficient specific factual scenario to establish a plausible factual foundation for her allegations of police officer misconduct.

Appellant's *Pitchess* motion referred to the portion of the police report narrating the circumstances of her arrest. The report indicated that LAPD Officers Hartman and Prodigalidad and Probation Officer Chon observed appellant "remove a blue steel handgun with brown wooden grips from her waistband and . . . . throw the handgun over a wall" that was covered with green foliage. The gun was recovered by Officers Hartman and Prodigalidad immediately following appellant's arrest.

A declaration signed by defense counsel and attached to appellant's *Pitchess* motion challenged her connection to the handgun: "She denied having a firearm on her possession to law enforcement. The defendant believes that these officers have lied about seeing her toss this gun. She continues to deny possession of the recovered firearm." The police report attached to appellant's *Pitchess* motion included details of appellant's postarrest statement in which she stated that while running from the police she tried to discard the "narco" in her possession, but was unable to get it "out of her right pants coin pocket."

The trial court denied the *Pitchess* motion, stating, "The factual scenario offered by counsel can be characterized as a mere denial." The court noted that the *Pitchess* motion claimed the police officers lied only about appellant throwing the firearm away. The only factual account of the incident was incorporated in the police report. The police

17

officer's version of events as to how the chase occurred, what was found on appellant, and appellant's explanation why she ran from the police was uncontroverted.

The sole and exclusive means by which citizen complaints against police officers may be obtained are the *Pitchess* procedures codified in sections 832.7 and 832.8 and Evidence Code sections 1043 and 1045. (*Brown v. Valverde* (2010) 183 Cal.App.4th 1531, 1539.) A *Pitchess* motion must include, among other things, an affidavit showing good cause for the discovery sought. (Evid. Code, § 1043, subd. (b)(3); *Galindo v. Superior Court* (2010) 50 Cal.4th 1, 12.) "To show good cause as required by [Evidence Code] section 1043, [the] declaration in support of a *Pitchess* motion must propose a defense or defenses to the pending charges" and "articulate how the discovery sought may lead to relevant evidence or may itself be admissible direct or impeachment evidence [citations] that would support those proposed defenses." (*Warrick v. Superior Court* (2005) 35 Cal.4th 1011, 1024 (*Warrick*).) The declaration "must also describe a factual scenario supporting the claimed officer misconduct." (*Ibid.*) The threshold showing of good cause required to obtain *Pitchess* discovery is "relatively low." (*City of Santa Cruz v. Municipal Court* (1989) 49 Cal.3d 74, 83, 94.) We review *Pitchess* orders under the abuse of discretion standard. (*People v. Hughes* (2002) 27 Cal.4th 287, 330.)

Contrary to appellant's assertion, she did not make a good cause showing by merely denying the relevant specific fact alleged in the officers' report. Because the police report described the actions of Officers Hartman, Prodigalidad, and Probation Officer Chon during the chase and arrest, it was incumbent on appellant to present a specific factual scenario different from the scenario presented in the police report. The officers reported seeing appellant *throwing* a blue steel handgun over a wall. Appellant denied ever having a gun but did not offer an alternative factual scenario regarding what her specific actions were (e.g., she made no throwing motion at all, she threw some other object over the wall, or she threw some narcotics over the wall, etc.). On appeal, appellant contends that her postarrest statement that she tried to throw away the narcotics in her pocket sufficiently provides an alternative plausible factual scenario to explain the

18

officers' alleged observation of her throwing the handgun. But, this contention has no merit. Appellant stated she was unsuccessful in removing the narcotics from her pants pocket, therefore she never made a throwing motion.

Appellant did not allege the officers planted the gun and lied about having seen her throw it. (See *People v. Thompson* (2006) 141 Cal.App.4th 1312, 1317 (*Thompson*) [court rejected defendant's explanation because it did not present a factual account of the scope of the alleged police misconduct].) Because appellant's *Pitchess* motion was, as the trial court concluded, simply a denial of the officers' report when she could and should have instead presented a specific, plausible, alternative factual scenario of officer misconduct, she did not make the good cause showing required for an in camera review of documents. (*Warrick, supra,* 35 Cal.4th at pp. 1023–1026.) Appellant did not present a specific factual scenario of police officer misconduct that might or could have occurred and was both internally consistent with and supportive of her defense. (*Id.* at p. 1026.)

Appellant contends the trial court misapplied "*Warrick* and its progeny" and improperly required appellant's factual scenario to be credible rather than plausible. The circumstances in this case are not of the type referred to in *Warrick* for which a mere denial of the officer's report may suffice. (*Warrick, supra,* 35 Cal.4th at pp. 1024–1025.) As the trial court noted, this case is similar to *Thompson*, in which the defendant was required to do more than merely deny the officer's report.

In *Thompson,* the defendant was standing near a street and sold cocaine base to an undercover police officer who gave him two marked $5 bills. (*Thompson, supra,* 141 Cal.App.4th at p. 1315.) Fellow "buy" team officers heard and saw the exchange and then other uniformed officers arrested the defendant after the transaction was complete and found the marked bills on the defendant. (*Ibid.*) In his *Pitchess* motion, the defendant asserted the officers planted evidence, acted dishonestly, and committed other misconduct. (*Thompson, supra,* at p. 1317.) The supporting declaration of his counsel stated that "'the officers did not recover any buy money from the defendant, nor did the defendant offer and sell drugs to the undercover officer.' The 'officers saw defendant

19

and arrested him because he was in an area where they were doing arrests.' When 'defendant was stopped by the police and once they realized he had a prior criminal history they fabricated the alleged events and used narcotics already in their possession and attributed these drugs to the defendant.' The charges 'are a fabrication manufactured by the officers to avoid any type of liability for their mishandling of the situation and to punish the defendant for being in the wrong area, at the wrong time and for having a prior criminal history. . . ."' (*Ibid.*) *Thompson* concluded the defendant's showing was insufficient because it was not internally consistent or complete. (*Ibid.*) The defendant "simply denied the elements of the offense charged." (*Ibid.*)

Because appellant, like the defendant in *Thompson,* did not provide an alternate version of the facts regarding her actions during the crucial event reported by the police officers (i.e., throwing a handgun over the wall) and did not otherwise dispute any other fact set forth in those reports, we, like *Thompson,* conclude appellant did not present a sufficient specific factual scenario of officer misconduct that was plausible considering the officer's report. (*Thompson, supra,* 141 Cal.App.4th at p. 1316; *Warrick, supra,* 35 Cal.4th at p. 1025.)

In our view, appellant has not set forth a proposed defense, established a plausible factual foundation for the alleged officer misconduct, or articulated a valid theory as to how the requested information might be admissible at trial. Given the foregoing circumstances, appellant was not entitled to have the trial court review the requested records in camera to determine what information, if any, should be disclosed. (*People v. Gaines* (2009) 46 Cal.4th 172, 178–179.) The trial court did not abuse its discretion by denying appellant's *Pitchess* motion.

**DISPOSITION**

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J. *

FERNS

We concur:


_____, P. J.

BOREN


_____, J.

ASHMANN-GERST

---

\*     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.